```
             UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
                  02-CV-3677(JMR/FLN)
```

In re Metris Companies, Inc., )
Securities Litigation         )         ORDER

Plaintiffs in this class action lawsuit claim defendants, Metris Companies, Inc. ("Metris"), Ronald Zebeck, and David Wesselink, violated the Securities Exchange Act of 1934. The class claims its members were injured when defendants made false statements and failed to disclose unsound business practices between November 5, 2001, and July 17, 2002. Defendants seek summary judgment and a dismissal of plaintiffs' claims. Defendants' motions are granted.

I. Background

At all times relevant herein, Metris was a company engaged in the financial services industry. During the class period, its primary business was providing credit cards to individuals with low to moderate incomes. These credit cards were provided through Direct Merchants Credit Card Bank ("DMCCB"), Metris's wholly-owned subsidiary. Ronald Zebeck was Metris's Chief Executive Officer and Chairman of the Board of Directors from its 1996 incorporation until December, 2002. Thereafter, he was replaced by David Wesselink, Chief Financial Officer and Vice Chairman during the class period.

Messrs. Zebeck and Wesselink held substantial Metris shares – not a single one of which was sold – during the class period. Mr.

Zebeck did give his children a gift of 10,000 shares during the class period, while Mr. Wesselink never moved any of his 316,621 shares.

Plaintiffs' designated class period begins November 5, 2001, and ends July 17, 2002. November 5, 2001, marks the date on which the Office of the Comptroller of the Currency ("OCC") began an audit of DMCCB. DMCCB is a national banking association. As such, it is subject to OCC supervision and regulation. According to plaintiffs, this examination began ahead of schedule. Plaintiffs claim this fact should have alerted defendants to their financial trouble. Metris released the OCC's examination results on April 16, 2002. Three months later, on July 17, 2002, Metris announced a loss of $36.4 million, or $0.74 per share, during 2002's second quarter.

A. <u>The OCC Investigation</u>

Federal regulations require annual, confidential, on-site examinations of OCC-regulated national banks. These regulations bar the parties from revealing the subject matter of ongoing examinations. 12 C.F.R. § 4.37(b). When an examination is concluded, the OCC issues a Report of Examination ("Report").

On January 16, 2002, with the OCC's permission, Zebeck advised shareholders that DMCCB had changed its charge-off policy. A bank's "charge-off" date is the point at which it recognizes a loan

as non-performing, and enters the loss on its books. The OCC reduced DMCCB's time before charge-off from 180 to 120 days. With this change, DMCCB immediately recognized as losses a substantial number of credit card debts it had previously classified as performing assets. In doing so, DMCCB accelerated some $34 million in charge-offs into the fourth quarter of 2001.

In February, 2002, as part of the audit, the OCC conducted informal exit meetings with Metris executives, including Messrs. Zebeck and Wesselink. During these meetings, the OCC advised the officers of particular business practices the Report would address. The OCC gave Metris its Report on April 4, 2002. The Report's findings culminated in an agreement between DMCCB and the OCC negotiated between April 8 and April 16, 2002. The agreement was executed on April 16, 2006, and detailed business-practice changes to be implemented by Metris. On that same day, Metris filed an SEC Form 8-K, disclosing the agreement and its terms to the public.

B.  Earnings Guidances

On January 16, 2002, during the OCC investigation, Metris issued an earnings guidance estimating earnings per share. Metris management based these estimates on full-year forecasts, and on information prepared for monthly management meetings. The January earnings guidance predicted earnings in 2002 of $3.00 to $3.05 per share. Metris said it would not meet its guidance if growth or loss assumptions were incorrect.

On April 17, 2002, Metris issued a press release concerning the OCC agreement and revised its 2002 earnings guidance. It announced first-quarter earnings of $0.54 per share, but advised the market of a slowdown in consumer spending, coupled with a significant decrease in receivables during March. This earnings guidance lowered the January, 2002, annual earnings projection to $1.75 to $2.25 per share. Metris said the new guidance was not related to the findings of the OCC investigation.

On July 17, 2002, the last day of the class period, Metris issued a statement announcing a second quarter loss. In this announcement, Metris declined to offer earnings guidance for the remainder of 2002.

    C.  <u>Alleged Misstatements</u>

Plaintiffs claim defendants, throughout the class period, wrongfully represented Metris as a prudent, responsible, financial institution with an expectation for growth and profits in 2002. Plaintiffs claim Metris's most significant misrepresentations were made in statements issued by Messrs. Zebeck and Wesselink.

Specifically, plaintiffs point to a January 16, 2002, Metris press release which quoted Zebeck as stating: "Metris has closed out another year of record earnings." The press release included the company's 2002 earnings guidance of $3.00 to $3.05 per share in 2002. That same day Zebeck and Wesselink held an analyst and shareholder conference call during which, among other things,

Zebeck said: "We remained disciplined with respect to our risk based pricing. . . . With the agreement of regulatory authorities we have concluded that these accounts should be . . . charged off at 120 days instead of 180 days."

During this same call, Wesselink said the "business is on a much stronger profitability track than it has ever been." Zebeck alluded to Metris's relationship with the OCC, saying:

> [W]e have a very, very good relationship with the OCC. . . . I think our policies are pretty sound, our accounting is pretty sound. If anything, our accounting is more conservative than the GAAP would require relative to it. But I think I'd state this statement again. I think all the issues have been on the table, have been addressed, and we have a very good working relationship and we hope that will continue.

On January 25, 2002, Metris held its annual Investors Conference. During that conference Zebeck stated:

> [Metris] anticipated many [regulatory developments and economic factors] and we are making the necessary adjustments to minimize the impact that they will have on our business. . . . [Metris is] well-positioned and well prepared to face the[ ] challenges ahead of us. . . . [W]e are taking a conservative approach to our losses, given this uncertain economy. . . . [W]e have built a fundamentally sound business that is clearly poised for continued profitability.

During the January 25, 2002, conference, Wesselink spoke of the OCC's examination, stating:

> It's the same exam that every bank in this country undergoes on a periodic basis and we're no different than everyone else. We do have an extremely good working relationship with these examiners. And we've found that in the course of the examination many of the suggestions that they've made to us are going to result in improved

>procedures, improved processes, improved controls, as we implement those suggestions.

Shortly thereafter, Wesselink cautioned:

>Now, let's face it. We live in a regulated environment, things can change. They can change three months from now, ten months from now, three years from now. That's just a fact of life. But as a result of this examination we think everything is on the table at this point.

Wesselink also addressed the January guidance, saying it "is based on a set of very achievable objectives."

On March 22, 2002, Metris filed a 10-K report with the SEC. The SEC responded several months later by letter dated July 15, 2002, addressed to Wesselink. The SEC noted several problems with the March filing, saying, "disclosures of the allowance and provision for loan losses do not separately discuss the allowance on an owned basis." Additionally "gross and net charge-offs exceeded [Metris's] beginning allowance for loan losses balance for the latest three fiscal years." Finally, the SEC said "the caption 'allowance for loan losses' suggests that the value of retained interests is reduced by credit losses."

Metris issued an April 17, 2002, press release which contained a revised guidance, estimating reduced earnings of between $1.75 to $2.25 per share. During a conference call that day, Zebeck stated:

>But we're being a lot more conservative, maybe in some cases even pessimistic about what the second half of the year is going to be. . . . We're feeling that the numbers out there are pretty strong and that there [are] no negative trends based on any of the discussions that we've had today.

6

Zebeck also said the OCC audit had no impact on the revised earnings guidance, but was instead based on revenue and growth.

Plaintiffs claim these representations, together with certain unsound business practices and the OCC investigation, establish their securities fraud claim.

II. Discussion

   A. Standard

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Liberty Lobby, 477 U.S. at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Liberty Lobby, 477 U.S. at 247-48 (emphasis in original). If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. See Celotex, 477 U.S. at 322.

On summary judgment, the Court makes all inferences in favor of the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

B. <u>Securities Fraud</u>

The Securities Exchange Act of 1934 provides a private cause of action for those injured by a securities fraud. The Act "forbids (1) the 'use or employ[ment]. . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" <u>Dura Pharm., Inc. v. Broudo</u>, 125 S.Ct. 1627, 1631 (2005) (<u>quoting</u> 15 U.S.C. § 78j(b)). The basic elements of an action under this statute are:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

<u>Dura Pharm.</u>, 125 S. Ct. at 1631 (citations omitted).

Defendants' summary judgment motions claim plaintiffs have failed to provide sufficient evidence of material misrepresentations, scienter, and loss causation to present a triable case. They are correct.

1. <u>Material Misrepresentations</u>

Defendants challenge plaintiffs' showing of materiality, and deny the statements in question were false when made. For analytic

8

purposes, the Court groups defendants' alleged misstatements into three general categories: statements offering earnings guidance, growth projections, and assurances of general well-being; statements in the March 22, 2002, 10-K filing; and statements relating to the OCC investigation.

### a. Materiality

A material statement is one likely to significantly alter the available mix of information in the mind of a reasonable investor. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Materiality is typically a question of fact for a jury. In re Control Data Corp. Sec. Litig., 933 F.2d 616, 621 (8th Cir. 1991). But a court can find statements which are vague, mere hyperbole, or not significant enough to alter the mix of information immaterial as a matter of law. Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997). A statement accompanied by meaningful cautionary language may also be found immaterial. Id. at 548.

Here, the Court finds, as a matter of law, defendants have failed to meet their burden of establishing a jury question respecting their predictions of growth and profitability. Further, the Court finds statements such as, "business is on a much stronger profitability track than it has ever been," and "we have built a fundamentally sound business that is clearly poised for continued profitability," to be run of the mill, hortatory statements. They are mere puffery, which could not possibly significantly alter the

9

available mix of information in the mind of a reasonable investor. As such, they fail to present a jury question on the issue of materiality.[1] In the cold light of hindsight, defendants' projections were overly optimistic, but "economic prognostication, though faulty, does not, without more, amount to fraud." Polin v. Conductron Corp., 552 F.2d 797, 805 (8th Cir. 1977).

Broad statements concerning a company's financial well-being are not specific enough to be material. Plaintiffs offer statements such as, "I think our policies are pretty sound, our accounting is pretty sound," and "[Metris is] well-positioned and well prepared to face these challenges [that are] ahead of us. . . . [W]e are taking a conservative approach to our losses, given this uncertain economy," as statements which might materially affect the investment market. The class's reliance thereon is misplaced.

These plain vanilla statements are simply too vague to support a securities fraud action; the test is whether a reasonable investor would have considered such statements significant at the time. And a reasonable investor would not. There is nothing

---

[1] "[S]oft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." Parnes, 122 F.3d at 547 (quoting Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 211 (4th Cir. 1994) (citations omitted)).

concrete or substantial in these statements upon which a reasonable investor would base an investment decision.

Some of defendants' statements do meet the materiality threshold, but this does not necessarily conclude the inquiry. Defendants made some clearly material statements during the class period: defendants' January 16 and April 17, 2002, earnings guidances fall into this category. Each was a specific projection directed to analysts and investors advising them of projected earnings per share for the 2002 calendar year. Defendants' statements in the March, 2002, 10-K filing are similarly material. These were concrete statements about the company's health and financial well-being, and could be expected to influence the investment community.

Likewise, some Metris comments regarding the OCC were specific and likely important to investors and analysts. On January 16, 2002, Mr. Zebeck said: "I think all the issues have been on the table, have been addressed, and we have a very good working relationship and we hope that will continue." This statement is material. His declaration that all of the company's issues with the OCC had been addressed goes beyond puffery and vagueness. Such a statement may have been significant to a potential investor. As to these statements, the Court must look further.

### b. Veracity of Statements When Made

A party alleging securities fraud must show statements were false when made, and not merely "fraud by hindsight." In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002). Defendants claim plaintiffs fail to meet this burden. They are correct.

Plaintiffs' allusion to generalized statements regarding guidances, overall profitability, and financial well-being are, as discussed above, simply insignificant in the marketplace. But plaintiffs' major argument is that defendants, aware of their business practices and the on-going OCC investigation, should have known the business was in trouble. Plaintiffs claim that, with this knowledge, defendants should not have made positive statements about the company's condition. This argument fails. The fact that a company may have hit a rocky patch does not mean it has no positive prospects. The Court finds these allegations too general to pose a triable issue of fact.

Plaintiffs claim defendants knew or should have known their January 16, 2002, guidance was incorrect. They base this allegation on the $34 million accelerated-loss Metris recognized because of the change in delinquent-loan charge-offs from 180 to 120 days. This accounting change threw the accelerated loss into 2001's fourth quarter. The flaw in this argument is that this accounting change was disclosed to investors – not hidden - as part

of the January, 2002, guidance. Defendants told investors and the market that the new 120-day charge-off was accounted for in determining the guidance. Metris's optimistic earnings projection is a classic example of a forward-looking statement, and cannot, as a matter of law, be used as the basis for a securities fraud action.

> Predictions on future growth . . . will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out . . . . If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

Parnes, 122 F.3d at 547 (quoting Raab v. General Physics Corp., 4 F.3d 286, 290 (4th cir. 1993)). Metris's earnings guidances are not material misstatements for the purposes of a securities fraud action.

Plaintiffs' arguments touching the March, 2002, 10-K filing are similar. They claim the 10-K filing illustrates significant accounting problems of which defendants should have been aware. Plaintiffs advance no evidence beyond the SEC's critical response tending to show they knew of claimed accounting discrepancies when the 10-K was issued. The SEC outlined its concerns about the 10-K filing in a letter sent to defendants on July 15, 2002. The Court,

however, looks not only to the SEC's letter, but to defendants' response. Only two days after receipt of the letter, defendants issued a statement and declined to offer any earnings guidance for the remainder of the year. These facts and proffered evidence are simply insufficient in law, fact, or logic to support a triable question of whether defendants knew the information in the March, 2002, 10-K filing was false when it was sent it to the SEC. Defendants' banking deficiencies were problematic in 2001 and 2002, but they do not make out a case for securities fraud.

   Plaintiffs next offer defendants' statements regarding the OCC investigation – that their relationship with investigators was a good one, and all issues were on the table and had been addressed as evidence of fraud. The proffered evidence demonstrates a question of fact as to whether or not defendants knew these statements were false when made. This evidence shows defendants knew the OCC investigation began earlier than regularly scheduled, and there were indications that the exam was not going well beginning in December of 2001. This was, apparently, the point at which the OCC began to question DMCCB's asset quality and suggest changes to special collections programs, credit line increase strategies, and allowance for loan losses. The OCC reiterated these concerns during the February, 2002, exit meetings. Standing alone, these allegations might present a factual question to be determined by a jury. But they do not stand alone.

      2.  <u>Scienter</u>

To show a triable jury question and avoid summary judgment on a claim of securities fraud, plaintiffs must show defendants acted with the requisite scienter. This means plaintiffs must present a triable question of whether defendants acted intentionally or knowingly, or with a reckless disregard for the truth or falsity of a material statement. <u>Aaron v. S.E.C.</u>, 446 U.S. 680, 696 (1980); <u>Kushner v. Beverly Enterprises, Inc.</u>, 317 F.3d 820, 827-28 (8th Cir. 2003). Recklessness may be shown by "highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." <u>In re K-Tel Int'l, Inc. Sec. Litig.</u>, 300 F.3d 881, 893-94 (8th Cir. 2002) (<u>quoting</u> <u>K & S P'ship v. Cont'l Bank, N.A.</u>, 952 F.3d 971, 978 (8th Cir. 1991)). Evidence of motive and opportunity is relevant when attempting to establish scienter. <u>Id.</u> at 894.

This is where the case unravels; plaintiffs have failed to produce evidence of scienter. Instead, their case teeters on repeated, but unsupported, theories of motive and opportunity, mixed with a mere suggestion of recklessness. While scienter is generally a question of fact for the jury, neither plaintiffs'

motive and opportunity theory, nor their soupçon of recklessness, is sufficient to withstand summary judgment.

Plaintiffs are entirely unable to show motive. Here, neither Zebeck nor Wesselink sold a single share of stock during the class period; not one share of the more-than-3,000,000 shares they held. Certainly, both were working to obtain earnings bonuses and pay raises. This does not, however, suffice: it is well-established that a desire to get greater pay and bonuses attaches to executives in every company. Such a desire is not probative of the question of the executives' motivation to defraud the market. <u>Navarre</u>, 299 F.3d at 746 (stating that evidence of "self-serving motives for the company to appear profitable" is not sufficient under the motive and opportunity standard).

Plaintiffs advance a theory of executive recklessness, arguing defendants' various statements were offered regardless of the truth. The Court has previously found many of defendants' statements were not false when made as a matter of law. Plaintiffs' theory hangs on the possibility that Metris, Zebeck, and Wesselink made reckless statements, but only regarding the OCC investigation. This theory posits that Zebeck and Wesselink misled investors concerning the OCC investigation during a conference call on January 16, 2002, and during the January, 25, 2002, annual investors conference.

On those two dates, defendants publicly disclosed and discussed the OCC investigation. Both Zebeck and Wesselink characterized the company's relationship with the OCC as "very good;" each opined that all OCC issues were on the table and addressed at that point. Both Wesselink and Zebeck referred to the regulated environment in which banks operate, and Wesselink said the situation was subject to change. This is it; this is the sum of plaintiffs' claim of recklessness in support of their assertion of scienter. This evidence falls short.

Even in the face of a changing economy and Metris's shifting business strategies, such statements are wholly insufficient to show recklessness. Plaintiffs have not, and cannot, show defendants' statements were unreasonable or dangerous to potential investors. The OCC investigation was on-going when the statements were made. Banking regulations barred defendants from revealing the substance of the OCC investigation. Plaintiffs proffer only broad statements which are neither definite nor revealing enough to suggest recklessness on the part of defendants.

### 3. Loss Causation

Having found insufficient evidence of material statements and scienter, the Court need not reach the issue of loss causation. The Court cannot help but note, however, the dubious nature of plaintiffs' loss causation argument. Plaintiffs bear the burden of showing a causal connection between any material misrepresentation

17

and the consequent loss arising therefrom.  <u>Dura Pharm.</u>, 125 S. Ct. at 1634.

In an effort to meet this burden, plaintiffs tender Dr. Hakala's expert testimony.  In Dr. Hakala's view, Metris's actions provided the wind beneath Metris's share-price's wings the whole time.  Plaintiffs cling to this theory in the face of the incontrovertible fact that Dr. Hakala's analysis shows Metris's stock price actually declined following each of defendants' challenged statements.  Plaintiffs' ultimately claim Metris's share prices would have fallen even further if the truth had been made known to the investing public.  It does, however, strain the imagination to accept a thesis positing that a company's statement – like Metris's January, 2002, declaration that it was accelerating a $34,000,000 charge-off – is some form of sugar coating.  But the Court declines to decide this issue.

   C.  <u>Section 20(a)</u>

Plaintiffs allege Zebeck and Wesselink violated § 20(a) of the Securities and Exchange Act of 1934.  This claim must fail, in light of the Court's finding that plaintiffs failed to show a triable securities fraud claim.  <u>Deviries v. Prudential-Bache Sec., Inc.</u>, 805 F.2d 326, 329 (8th Cir. 1986).

III. <u>Conclusion</u>

Plaintiffs fail to show a genuine issue of material fact on crucial elements in this case for securities fraud.  For this

18

reason, defendants' motions for summary judgment [Doc. Nos. 256 and 274] are granted.

    IT IS SO ORDERED.

    LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  April 21, 2006

                                  s/James M. Rosenbaum
                                  JAMES M. ROSENBAUM
                                  United States Chief District Judge